Norma J. BAKER, on behalf of David Keith Baker, an infant; and Paul David Schaffner, on behalf of William Alan Schaffner, an infant; Plaintiff,

v.

DOWNEY CITY BOARD OF EDUCATION, Arnold Finch, Superintendent of Schools, Downey Unified School District, and Gus Shiney, Principal of Warren High School, sued herein in their official, individual, and representative capacities, Defendants.

No. 69–2327.

United States District Court
C. D. California.

Dec. 17, 1969.

John D. Maharg, County Counsel, James W. Briggs, Asst. County Counsel, and Elaine M. Grillo, Deputy County Counsel, Los Angeles, Cal., for defendants.

Joel R. Strote and Martin Z. N. Katz, Beverly Hills, Cal., for plaintiffs.

## MEMORANDUM OPINION FOR USE IN PREPARATION OF PROPOSED FINDINGS OF FACT, CONCLUSIONS OF LAW, AND JUDGMENT.

CRARY, District Judge.

Norma J. Baker and Paul David Schaffner, as guardians ad litem for their minor sons, David Keith Baker and William Alan Schaffner, said minor sons hereafter referred to as plaintiffs, complain of violation of the civil rights of their sons and for injunctive and declaratory relief under Title 42, United States Code, §§ 1981 and 1983, and Title 28, United States Code, § 2201.

William Schaffner, then a senior, and student body president of Earl Warren High School, was, on November 10, 1969, suspended from school for ten school days for use of "profanity or vulgarity" (Pltfs' Ex. 5), appearing in an off campus newspaper published by the plaintiffs.

David Baker, at the time a senior, and president of the senior class, was likewise suspended from school for ten school days on November 10, 1969, for the same reason. [Pltf's Ex. 6.]

Both boys were also removed from their school offices.

The reports on the suspensions given to the plaintiffs gave the reason for their suspensions and were issued in compliance with the Education Code of California, Sections 10602–10609. These reports on the suspensions (Exs. 5 and 6) were forms completed by the principal, Mr. A. H. Shiney, who testified that the said forms had been drafted and in use prior to his becoming principal some two years ago.

The plaintiffs and their parents were advised by the school authorities that the boys were removed from their student offices because of their failure to comply with their oath of office.[1]

Since November, 1968, the plaintiffs had jointly written, published and distributed to the students of Warren High School an off-campus newspaper entitled "Oink". Twelve issues were so published and distributed, nine of said issues before the controversial issue (Ex. 4), which, as the other issues, was distributed to students entering the campus for morning classes during the period from about 7:30 A.M. until the first class convened at 8:00 A.M. The distribution of all issues of Oink was made by plaintiffs by handing copies to students just outside the main gate to the campus. On November 5, 1969, copies of Exhibit 4 were being handed to students in that location by plaintiff Schaffner. Plaintiff Baker was standing nearby but inside the gate. Some 450 copies of Oink were given to students as they entered the campus on the morning of November 5, 1969. Copy of Exhibit 4 appears as an appendix hereto.

Warren High School has an enrollment of about 2300 students with a faculty of 95 teachers. Dr. Finch, with many years experience in the field of education, is the Superintendent of the Downey Unified School District in which Warren High School is located.

[1]. I solemnly promise that I will do my best to fulfill the requirements of the office to which I have been elected by the students of Warren Senior High School, that I will uphold and support the rules and regulations of the student body and the school, and I will set an example in scholarship and leadership which will be a pattern for conduct among the students and do everything within my power to uphold the highest standards of the school.

Mr. A. H. Shiney, also an experienced educator, has been principal of Warren High School for approximately two years. He has had some nineteen years experience in the School District. Mr. Thomas H. Robinson, in his eighth year at Warren High School, is the Assistant Principal. The ages of the students range from 13 to 19 years.

The plaintiffs contend that they were illegally suspended for the following reasons: (1) violation of their rights to free speech under the First Amendment of the United States Constitution, (2) without due process of law, (3) that the suspensions were for "habitual" profanity or vulgarity under the provisions of Section 10602, California Education Code,[2] whereas, if it be assumed, arguendo, that their constitutional rights to free speech were not violated, any profanity and vulgarity on their part was not "habitual" and that the said Code section sets forth the exclusive grounds for suspension for profanity or vulgarity, (4) that the plaintiffs did not violate their oath of office and their removal from office was not justified, and (5) there was no distribution of Oink on campus.

Defendants urge (a) that the November 5, 1969, issue of Oink (Ex. 4) contained profane and vulgar words in the Farber article appearing on the third and fourth pages, as well as in the advertisement on the second page, and vulgar retouching of what appears to be a photograph of President Nixon, a part of said advertisement, by the adding and positioning of a finger, (b) that the suspensions were not in violation of the plaintiffs' right to free speech but were within the authority of the High School administrators in performance of their obligation and duty to maintain a proper educational program with the necessary control and discipline of students to assure its success and to insure the careful supervision of the moral conditions in their school, as required by paragraph 24, Title 5, California Administrative Code,[3] (c) that the due process prescribed by Section 10607[4] is sufficient in the circumstances and that no other proceedings, such as a hearing prior to effecting suspension, are required to conform to the due process rights of plaintiffs, (d) that the plaintiffs rights to free speech were not violated, and (e) the plaintiffs, and each of them failed to uphold the rules and regulations of the student body and school and to set an example in leadership which would be a pattern for conduct among the students and failed to uphold the highest standards of the school, all as required by the terms of their oath of office. [Student by-laws, Article 4, Section 2, Defts.' Ex. I.]

### Free Speech

In support of their position that their constitutional rights to free speech have been violated, plaintiffs argue that the November 5, 1969, issue of Oink (Ex. 4)

---

2. § 10602. Continued willful disobedience, habitual profanity or vulgarity, * * * at any time or place shall constitute good cause for suspension or expulsion from school; however, no pupil shall be suspended or expelled unless the conduct for which he is to be disciplined is related to school activity or school attendance. * * *.

3. 24. *Moral Supervision.* Principals and teachers shall exercise careful supervision over the moral conditions in their respective schools. Gambling, immorality, profanity, frequenting public pool rooms, the use of tobacco, narcotics and intoxicating liquors on the school grounds, or elsewhere on the part of pupils shall not be tolerated.

4. § 10607. No pupil shall be suspended from an elementary school for more than two consecutive weeks.

* * * * *

On or before the third consecutive school day of any given period of suspension, the parent or guardian of the pupil involved shall be asked to attend a meeting with school officials, at which time the causes, the duration, the school policy involved, and other matters pertinent to the suspension, shall be discussed. If the parent or guardian fails to join in such a conference, the school officials shall send him by mail a letter stating the fact that suspension has been implemented and setting forth all other data pertinent to the action.

did not cause disruption or interference with the normal educational program at Warren High School and that they were merely expressing their views and opinions, which they had every right to do although such expression might be unpopular with some.

Zucker v. Panitz, 299 F.Supp. 102, 105 (S.D.N.Y., 1969), on which plaintiffs rely, involved the publishing in a school paper of a paid advertisement opposing the Vietnam war. The District Court held that the paper was open to the free expression of ideas and that the students were entitled to publish the advertisement on freedom of speech grounds.

Plaintiffs also cite Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), which case concerned the rights of a few high school students to wear black arm bands to protest the war in Vietnam. Five students were suspended. The Supreme Court held that the wearing of the arm bands was akin to free speech and that First Amendment rights were available to teachers and students, subject to application in light of the special characteristics of the school environment. The Court went on to say that a student may express his opinions on campus, even on controversial subjects, "* * * if he does so without 'materially and substantially interfer[ing] with the requirements of appropriate discipline in the operation of the school' and without colliding with the rights of others. Burnside v. Byars, supra, [5 Cir.] 363 F.2d [744] at 749." [Page 513, 89 S.Ct. page 740.]

What appears to be the test is set forth at page 509 of the opinion at page 738 of 89 S.Ct.:

"In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. Certainly where there is no finding and no showing that engaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,' the prohibition cannot be sustained. Burnside v. Byars, supra, 363 F.2d at 749."

The Court then goes on to say:

"In the present case, the District Court made no such finding,[3] and our independent examination of the record fails to yield evidence that the school authorities *had reason to anticipate* that the wearing of the armbands would substantially interfere with the work of the school or impinge upon the rights of other students. Even an official memorandum prepared after the suspension that listed the reasons for the ban on wearing the armbands made no reference to the anticipation of such disruption.

"On the contrary, *the action of the school authorities appears to have been based upon an urgent wish to avoid the controversy* which might result from the expression, even by the silent symbol of armbands, of opposition to this Nation's part in the conflagration in Vietnam.[4] " [Pages 509–510, 89 S.Ct. page 738.] [Emphasis added.]

In the case of Burnside v. Byars, 363 F.2d 744, 748 (5 C.A.1966), cited by the Supreme Court, supra, the Court states:

"The interest of the state in maintaining an educational system is a compelling one, giving rise to a balancing of First Amendment rights with the duty of the state to further and protect the public school system. The establishment of an educational program requires the formulation of rules and regulations necessary for the maintenance of an orderly program of classroom learning. In formulating regulations, including those pertaining to the discipline of school children, school officials have a wide latitude of discretion."

The Court also says that it is not for the court to consider whether such rules are wise or expedient but merely whether they are a reasonable exercise of the power and discretion of the school authorities.

In the instant case, Dr. Finch, the Superintendent of Schools, testified at length relative to his several conferences with the principal, Mr. Shiney, on November 5th, 6th and 7th, following distribution of Exhibit 4, as to what action should be taken against plaintiffs and as to his opinion that Exhibit 4 threatened the educational program of the school and would diminish control and discipline and as to his apprehension that unless action was taken promptly to discipline the plaintiffs there would be further disruption of and interference with the educational program.

Mr. Shiney testified that he had reached similar conclusions. He also testified as to the disruption and interference with classroom study and teaching following the distribution of Exhibit 4 on November 5th. A few teachers testified that there were disruptions in their classes and some testified to the contrary. On cross-examination, Mr. Shiney stated that some 25 to 30 teachers had told him of their classes being interrupted and of failure in attention on the part of students due to their reading of and talking about Oink during class. Mr. Robinson concurred.

### Due Process

■ Section 10607 of the Education Code, supra, provides, in part, that the parent of a pupil suspended shall, before the third school day of the period of suspension, be asked to attend a meeting with school officials at which time the causes, the duration, the school policy involved, and other matters pertinent to the suspension, shall be discussed.

No specific request was made of the plaintiffs' parents to attend a meeting with school officials but Mrs. Baker, mother of David Baker, called on Dr. Finch on November 12th and he discussed with her the items mentioned in Section 10607. On November 12th, Mr. Schaffner, father of Bill Schaffner, talked to Dr. Finch in his office about the same matters, as well as the reason for Bill's removal from school office. Dr. Finch also showed both Mrs. Baker and Mr. Schaffner the pertinent sections of the California Education Code and provisions of the School Board policy adopted by the Downey Unified School District, which were relied on in suspending their sons. He also talked to Mrs. Schaffner, mother of Bill, on the telephone concerning the suspension.

Mr. Shiney talked to Mr. Schaffner, the father, about Exhibit 4 and other aspects of the suspension, and conferred with Mrs. Baker about one and one-half hours about the suspensions, the reasons and authority therefor, and the policy of the school involved, on November 12th.

The Court concludes that the intent and purpose of the provisions of Section 10607 of the Education Code, supra, as to required procedure, were fulfilled.

Plaintiffs further contend that their rights to procedural due process required that they be given specifications of charges, notice of hearing, and a hearing, prior to the suspensions.

Judge Moore, in Madera v. Board of Education, etc., 386 F.2d 778, 789 (2 C. A.1967), states:

> "Law and order in the classroom should be the responsibility of our respective educational systems. The courts should not usurp this function and turn disciplinary problems, involving suspension, into criminal adversary proceedings—which they definitely are not."

That case concerned the right of the student to an attorney in a District Superintendent's Guidance Conference.

■ Due process is not a fixed, inflexible procedure which must be accorded in every situation. It varies with the circumstances involved. In the instant case, the school officials were charged with the conduct of the educational program and if the temporary suspension of a high school student could not be ac-

complished without first preparing specifications of charges, giving notice of hearing, and holding a hearing, or any combination of these procedures, the discipline and ordered conduct of the educational program and the moral atmosphere required by good educational standards, would be difficult to maintain.

It appears to the Court that, having in mind all of the facts and circumstances here involved, the plaintiffs' administrative procedural rights were accorded them by the school officials and the applicable principles of due process were satisfied.

What would constitute procedural due process before a student be *expelled*, as distinguished from temporary suspension, is not before the Court.

In the case of Soglin v. Kauffman, 295 F.Supp. 978 (W.D.Wis.1968), relied on by plaintiffs, the District Court speaks of students expelled or suspended:

> " * * * for a period of time substantial enough to prevent one from obtaining academic credit for a particular term * * *." [Page 988.]

The complaint alleged that two defendants had been expelled and others threatened with " * * * suspension, expulsion or other denial of matriculation * * * for alleged violation of the doctrine of 'misconduct' and by reason of the application of the doctrine of 'misconduct'."[2]

We are not here concerned with the drastic disciplinary action taken or proposed to be taken in the *Soglin* case, and the procedural due process indicated as being requisite in that case would, therefore, not be necessary in the case at bar.

The *Soglin* case, supra, also held that sanctions for "misconduct" would fall as the term is unconstitutionally vague. Plaintiffs seek to apply the same rule as to "profane" and "vulgar". They state, in their supplemental memorandum, that "profane" means irreverence or contempt for God, unholy, heathen and, in its broader sense and usage, *"common"* or *"vulgar"*.

■ A state law, rule or regulation, governing the conduct of high school students must be sufficiently definite to provide notice to reasonable students that they must conform their conduct to its requirements and may not be so vague that persons of common intelligence must guess at its meaning but the requirement for reasonable certainty in the school laws and regulations does not preclude the use of ordinary terms which find adequate interpretation in common usage and understanding. Budd v. Madigan, 9 C.A.1969, 418 F.2d 1032. In that case the court ruled on the alleged vagueness of California Penal Code, Section 647(f).

"Profane" and "vulgar" fall within the rule as stated in Budd v. Madigan, supra, and the cases cited therein.

### Grounds for Suspension

Defendants deny that Section 10602[2] of the Education Code states the only grounds for temporary suspension of a statute and assert that the suspensions in the instant matter were not based on that Section although it is cited as one of those relied on in the "Report of Suspension" (Exs. 5 & 6) given to each of the plaintiffs by Mr. Shiney on November 5, 1969.

The Attorney General of California has rendered an opinion covering the issue as to the exclusiveness of Section 10602, Education Code, with respect to the grounds for the expelling of a student. 48 Opinions, Attorney General, California, page 4, 7 (1966). The question discussed was whether a student could be legally expelled for conduct away from the school premises which involved a morals charge. In answering in the affirmative, the Attorney General says:

> "Misconduct on the way to and from school subjects pupils to suspension or expulsion. See section 13557, * * *."

Section 24 of Title 5 of the California Administrative Code[3] is then cited and quoted in part:

"Principals and teachers shall exercise careful supervision over the moral conditions in their respective schools * * *."

Thereafter the Attorney General says:

"These references clearly show that the grounds for discipline listed in section 10602 are *not exclusive*.

"Historically the governing board of a school district has had the power to discipline a pupil for conduct 'which has a direct and immediate tendency to influence the conduct of other pupils while in the schoolroom, to set at naught the proper discipline of the school, to impair the authority of the teachers, and to bring them into ridicule and contempt. Such power [to discipline for conduct occurring outside of school] is essential to the preservation of order, decency, decorum, and good government in the public schools.' State ex rel. Dresser v. District Board ([135] Wis. [619]), 116 N.W. 232, 235, [16 L.R.A.,N.S., 730] (1908)." [Emphasis added.]

Dr. Finch testified that the suspensions were made on the authority of Education Code Sections 10604 [5], 10607.-5, 10609 [6] and 13557 [7], School Board Policies 2410 (Ex. E), 2412 (Ex. Q), 2430 (Ex. F), and his administrative statement dated August 25, 1969 (defts' Ex. R). These authorities are cited in Dr. Finch's memorandum to Mr. Shiney dated November 7, Exhibit D, which was issued before the suspensions were effected. The date, November 12, second

line, first paragraph, should be November 5.

Mr. Shiney stated that he, too, relied on the above cited authority, less Exhibit R. He also considered Board Policy 2320 (Exhibit H), which makes the principal responsible for the activities of secondary student bodies.

Board Policy 2410 (Exhibit E) provides that the Board of Education expects students to maintain high standards of personal conduct reflecting respect and responsibility for themselves and others. Policy 2410, under "Areas of Responsibility", states that the Board expects students to maintain high standards of personal conduct and that students may be denied the right to attend school for violation of laws and reasonable rules and regulations. The Policy further states:

"As Education Code 7851 states: 'Each teacher shall endeavor to impress upon the minds of the pupils the principles of morality, truth, justice, and patriotism, to teach them to avoid idleness, profanity, and falsehood, to instruct them in the principles of free government, and to train them up to a true comprehension of the rights, duties, and dignity of American citizenship.' Punishment, administered as the ultimate phase of school district policy, is intended to reform the wrongdoer and to serve as a deterrent to others." [Exhibit E, 3rd page.]

Board Policy 2412, (Exhibit Q) specifies areas of responsibility of administrative personnel, teachers, students and par-

5. § 10604. Membership in secret clubs prohibited.

 * * * * *

The governing board of any school district may make and enforce all rules and regulations needful for the government and discipline of the schools under its charge. Any governing board shall enforce the provisions of this section by suspending, or, if necessary, expelling a pupil in any elementary or secondary school who refuses or neglects to obey any such rules or regulations.

6. § 10609. All pupils shall comply with the regulations, pursue the required course of study, and submit to the authority of the teachers of the schools.

7. § 13557. Every teacher in the public schools shall hold pupils to a strict account for their conduct on the way to and from school, on the playgrounds, or during recess. * * *.

ents. With respect to school principals, it states, in part:

"Each school principal shall be responsible to the Superintendent for student control in his school and for all personnel within his jurisdiction. He shall have the responsibility and authority to carry out school district policies and regulations."

As to students:

"All students shall comply with the regulations, pursue the required course of study, and submit to the authority of the teachers and staff of the school. (E.C. 10609) They shall also be expected to conform to the laws of the community, state, and nation. They shall be encouraged, through student government and other types of student activities appropriate to their levels of maturity, to assume responsibility for controlling their own conduct (self-discipline)."

The authority of the principal is further bolstered by Sections 24 [3] and 62 [8] of Title 5, California Administrative Code. Said Section 62 requires pupils to " * * * refrain *entirely* from the use of profane and vulgar language." [Emphasis added.]

 In measuring the reasonableness of the suspensions, the Court must give credence to the role and purpose of the schools and the means available to school administrators to deal with their problems.

 The Court finds that there is ample authority to support the temporary suspensions here involved and that the grounds for discipline listed in Section 10602, supra, are not exclusive. The Court further finds that the action taken was a reasonable exercise of the power and discretion of the secondary school authorities in the maintaining of an atmosphere conducive to an orderly program of classroom study and learn-

ing and respect for legitimate and necessary administrative rules and State laws. Goldberg v. Regents of the University of California, 248 Cal.App.2d 867 (1967), 57 Cal.Rptr. 463, 472 (involved suspension and expulsion of students as a result of use of "profane and obscene" language); Scoville v. Board of Education, etc., 286 F.Supp. 988, 991–992 (N. D.Ill.1968); and Schwartz v. Schuker, 298 F.Supp. 238, 240–242 (E.D.N.Y. 1969).

The Schwartz case involved distribution, off school grounds but near the property of the high school, of Issue No. 5 of a newspaper entitled "High School Free Press." The paper criticized the school principal and other members of the administration. In denying a preliminary injunction to mandate the reinstatement of the plaintiff, who was expelled, the Court pertinently observes:

"A special note should be taken that the activities of high school students do not always fall within the same category as the conduct of college students, the former being in a much more adolescent and immature stage of life and less able to screen fact from propaganda." [Page 242.]

*Grounds for Removal From Student Office.*

 The publication and distribution of Exhibit 4, with its multiple vulgarisms, would appear to be sufficient to evidence the violation of the student officers' oath.[1] However, there was other conduct on the part of the plaintiffs in derivation of their obligation to set an example in leadership which would be a pattern for conduct among the students and their obligation to do everything to uphold the highest standards of the school. In this regard, both plaintiffs had been previously threatened with suspension, plaintiff Baker for failing to comply with the standards of student

---

8. 62. Pupil Shall Attend Regularly. Every pupil must attend school punctually and regularly; conform to the regulations of the school; obey promptly all the directions of his teacher and others in authority; observe good order and propriety of deportment; be diligent in study; respectful to his teacher and others in authority; kind and obliging to schoolmates; and refrain entirely from the use of profane and vulgar language.

grooming with respect to his sideburns (Ex. S, pg. 14) after being twice warned, over a period of two weeks, to do so, and plaintiff Schaffner, after warning, had to be sent home to remain until he conformed to the student dress code (Ex. S, pg. 14).

Plaintiffs were frank in stating that they insisted on publishing Oink because they wanted a platform for uninhibited criticism of the administration and for a forum available to students to present their ideas which, plaintiffs knew, would not be allowed to appear in the school paper, "Justice".

The negative attitude of Oink was discussed by Mr. Shiney with plaintiffs, also their failure to be constructive in their criticism of the administration and their lack of a positive program, but no disciplinary action was taken until Exhibit 4 was distributed. All members of the student council, including plaintiffs, had, on more than one occasion, been cautioned to remember that all of their acts reflected on the school and the student body.

Following distribution of Exhibit 4 and prior to the suspensions, there were numerous inquiries by parents in the school district, students, teachers, and at least one public official, as to what the school officials were going to do about the vulgarities in Exhibit 4, and some students were taking the position that if the plaintiffs were not to be restrained that there was no reason why they could not use the same manner of expression on campus.

It appears there was ample evidence to justify the removal of plaintiffs from their student offices although whether such removal poses a violation of constitutional rights is questionable.

■ Plaintiffs' insistence that Oink was not distributed on campus is of little aid to their case. First, the fact the distribution was technically not on campus because the paper was handed to students just outside the main gate does not mitigate against the fact that plaintiffs knew the students were entering the campus for class and also knew and intended that Oink would be well distributed on campus. Secondly, for the reasons stated hereinabove and the authorities referred to, the fact the acts which resulted in the distribution on campus were not actually performed on campus is of no consequence. The school authorities are responsible for the morals of the students while going to and from school, as well as during the time they are on campus.

■ Plaintiff Schaffner stated to one or more fellow students that plaintiffs' November 5th issue of Oink included the objectionale Farber article, advertisement, poem and nude, because they wanted to see how far they could go with the administration. Testing of authority is as old as human relations and is not limited to young people. However, when the bounds of decency are violated in publications distributed to high school students, whether on campus or off campus, the offenders become subject to discipline.

The Supreme Court of the United States recently observed, in Ginsberg v. New York, 390 U.S. 629, 638, 88 S.Ct. 1274, 1280, 20 L.Ed.2d 195 (1967):

> " * * * we have recognized that even where there is an invasion of protected freedoms 'the power of the state to control the conduct of children reaches beyond the scope of its authority over adults * * *.' Prince v. Massachusetts, 321 U.S. 158, 170, 64 S.Ct. 438, 88 L.Ed. 645.[6] "

*Pornography—Not an Issue.*

We are not here confronted with the issue of whether the controversial forms of expression in Exhibit 4 are pornographic. If such were the case, it could well be argued that the plaintiffs would be justifiably confused by incomprehensible legalese. The meanings of "vulgar" and "profanity" do not prompt such confusion.

Neither "pornography" nor "obscenity", as defined by law, need be established to constitute a violation of the rules against profanity or vulgarity, or as a

reason for interference with discipline, or to justify the apprehension of experienced school administrators as to the impairment of the school's educational process in the instant case. Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, supra.

 Referring again to the First Amendment, freedom of speech is not the right to say anything one may please in any manner or place. The rule that the constitutional right to free speech and assembly may be infringed by the State, if there are compelling reasons to do so, must also be considered.

"The interest of the state in maintaining an effective and efficient school system is of paramount importance. That which so interferes or hinders the state in providing the best education possible for its people, must be eliminated or circumscribed as needed. *This is true even when that which is condemned is the exercise of a constitutionally protected right.*" Ferrell v. Dallas Independent School District, 5 Cir., 392 F.2d 697, 703. [Emphasis added.]

The plaintiffs urge that the words in the Farber article, which they adopted by their acts and writings, (Exhibit P, page 2), are not profane or vulgar unless considered out of context. Several of the words used in the Farber article, as identified by Dr. Finch, were obviously profane and vulgar in context as well as out. There were also vulgarities in the advertisement on the second page of Exhibit 4, which were mentioned hereinabove. It appears to the Court that the School administrators were amply justified in their conclusion that Exhibit 4 contained profane and vulgar expressions. The instant case is to be distinguished from Tinker v. Des Moines Independent Community School District, Zucker v. Panitz, and Burnside v. Byars, all supra. In those cases, profanity and vulgarity were not involved, only the right to espouse a cause, political or otherwise, which did not disrupt the educational program of the school involved. In our case, plaintiffs were not disciplined for the criticism of the school administrators and the faculty, or of the Vietnam war, but because of the profane and vulgar *manner* in which they expressed their views and ideas. Several of the prior issues of Oink, all of which are in evidence, contained articles critical of the school administration, but no disciplinary action was taken until Exhibit 4 was distributed.

Having in mind all of the facts and circumstances in this case, the Court determines that the plaintiffs' First Amendment rights to free speech do not require the suspension of decency in the expression of their views and ideas. The right to criticize and to dissent is protected to high school students but they may be more strictly curtailed in the mode of their expression and in other manners of conduct than college students or adults. The education process must be protected and educational programs properly administered.

The evidence in this case discloses the good scholarship records of the plaintiffs and their leadership abilities. They will soon be in college and then take their place in the adult world. Regardless of how this litigation may ultimately terminate, should appeal be perfected, it would surely be a source of great satisfaction to all concerned if David Baker and Bill Schaffner could, during the last semester in high school, bring themselves to directing their abilities to the interest of Earl Warren High School within the rules which are required to effect its educational program in a good moral environment. They could well graduate with honors for their efforts in the school's behalf rather than be remembered as leaders who finished high school contesting the rights of the administration to encourage and enforce good moral standards for the members of the student body, both on and off campus.

The Court decides that the school officials took such action as in their discretion the situation required and in a conscientious endeavor to fulfill their duty to the State and the members of the stu-

dent body, that the action was appropriate in the circumstances and supported by the authorities.

Plaintiffs are not entitled to the injunctive or declaratory relief sought by their complaint.

Defendants' counsel is requested to prepare, serve and lodge Findings of Fact, Conclusions of Law and Judgment, in accordance with the provisions of Rule 7, Local Rules of this Court.

## APPENDIX

# oinK page two YOWSA!

# THE STUDENT AS NIGGER

## by jerry farber

## SECOND & FINAL PART

(Synopsis-of-sorts: In the first part, the author compared the situation of a student relating to the teacher to a black man relating to a white society. In this excerpt, he turns his attention to high schools and teachers in general.)

Then there is the infamous "code of dress". In some high schools,if your skirt looks too short, you have to kneel before the principal, in a brief allegory of fellatio. If the hem doesn't reach the floor, you go home to change. Boys in high school can't be too sloppy and they can't be too sharp. You'd think the school board would be delighted to see all the spades trooping to school in pointy shoes, suits, ties and stingy brims. Uh-uh, they're too visible.

What school amounts to, then, for white and black kids alike, is a 12 year course in how to be slaves. What else could explain what I see in a freshman class? They've got that slave mentality; obliging and ingratiating on the surface but hostile and resistant underneath. Like black slaves, students vary in their awareness of what's going on. Some recognize their own put-on for what it is and even let their rebellion break through to the surface now and then. Others -- including most of the "good students" -- have been more deeply brainwashed. They swallow the bullshit with greedy mouths. They honest-to-God believe in grades, in busy work, in general education requirements. They're like those old grey-headed houseniggers you can still find in the South who don't see what all the fuss is about because Mr. Charlie "treats us real good."

College entrance requirements tend to favor the Toms and screen out the rebel. Not entirely, of course. Some students at Cal State are expert con artists who know perfectly well what's happening. They want to get a degree and spend their years on the old plantation alternately laughing and cursing as they play the game. If their egos are strong enough, they cheat a lot. And of course, even the Toms are angry down deep somewhere. But it comes out in passive rather than active aggression. They're unexplainably thick-witted and subject to frequent spells of laziness. They misread simple questions. They spend their nights mechanically outlining history chapters while meticulously failing to comprehend a word of what's in front of them.

The saddest cases among both black slaves and student slaves are the ones who have so thoroughly introjected their masters' values that their anger is all turned inward. At Cal State these are the kids for whom every low grade is torture, who stammer and shake when they speak to a professor. They go through an emotional crisis every time they're called upon during class. You can recognize them easily at finals time. Their faces are fast oned with fresh pimples; their bowels boil audibly across the room. If they're really in a Last Judgment, then the parents and teachers who created these wrecks are going to burn in hell.

So students are niggers. It's time to find out why, and to do this, we have to take a long look at Mr. Charlie.

The teachers I know best are college professors. Outside the classroom, and taken as a group, their most striking characteristic is timidity. They're short on balls. Just look at their working conditions. At a time when even migrant workers have begun to fight and win, college professors are still afraid to make more than a token effort to improve their pitiful economic status. In California state colleges the faculties are screwed regularly and vigorously by the governor and legislature and yet they still won't offer any solid resistance. They lie flat on their stomachs with their pants down

[A725]

---

mumbling catch-phrases like, "professional dignity" and "meaningful dialogue."

Professors were no different when I was an undergraduate at UCLA during the McCarthy era; it was like a cattle stampede as they rushed to cop out. And in more recent years, I found that my being arrested in sit-ins, brought from my colleagues not so much approval or condemnation as open-mouthed astonishment: "You could lose your job!"

Now, of course, there is the Vietnamese war. It gets some opposition from a few teachers. Some support it. But a vast number of professors, who know perfectly well what's happening, are copping out again. And in the high schools you can forget it. Stillness reigns.

I'm not sure why teachers are so chickenshit. It could be that academic training itself forces a split between thought and action. It might also be that the tenured security of a teaching job attracts timid persons who are unsure of themselves and need weapons and other external trappings of authority.

At any rate, teachers are short on balls. And, as Judy Einstein has eloquently pointed out, the classroom offers an artificial and protected environment in which they can exercise their will to power.

Your neighbors may drive a better car; gas station attendants may intimidate you; your wife may dominate you; the state legislature may shit on you; but in the classroom, by God, students do what you say-or-else. The grade is a hell of a weapon. It may not rest on your hip, potent and rigid like a cop's gun, but in the long run it's more powerful. At your personal whim -- anytime you choose -- you can keep 35 students up for nights and have the "pleasure" of seeing them walk into the classroom pasty-faced and red-eyed carrying a sheaf of typewritten pages, with a title page, MLA footnotes and margins set at 15 and 91.

The general timidity which causes teachers to make niggers of their students usually includes a more specific fear -- fear of students themselves. After all, students are different, just like black people. You stand exposed in front of them, knowing that their interests, their values and their language are different from yours. To make matters worse you may suspect that you yourself are not the most engaging person. What then can protect you from their ridicule and scorn? Respect for authority. That's what. It's the policeman's gun again. The white bwana's pith helmet. So you flaunt that authority. You wither whisperers with a murderous glance. You crush objectors with erudition and heavy irony. And, worst of all, you make your own attainments seem not accessible but awesomely remote. You conceal your massive ignorance and parade a slender learning.

Finally, there's the darkest reason for all for the master-slave approach to education. The less trained and the less socialized a person is, the more he constitutes a sexual threat and the more he will be subjugated by institutions, such as penitentiaries and schools. Many of us are aware by now of the sexual neurosis which makes white men so fearful of integrated schools and neighborhoods, and which makes castration of Negroes a deeply entrenched Southern folkway. We should recognize a similar pattern in education. There is a kind of castration that goes on in schools. It begins, before school years, with parents' first encroachments on their children's free un-ashamed sexuality and continues right up to the day when they hand you your doctoral diploma with a bleeding shrivaled pair of testicles stapled to the parchment. It's not that sexuality has no place in the classroom. You'll find it there but only in certain perverted and vitiated forms.

How does sex show up in school? First of all, there's the sadomasochistic relationship between the teachers and students. That's plenty sexual although the price of enjoying it is to be unaware of what's happening. In walks the student in his Ivy League equivalent of a motorcycle jacket. In walks the teacher -- a kind of intellectual rough trade -- and flogs his students with grades, tests, sarcasm, and snotty superiority until their very brains are bleeding. In Swinburne's England, the whipped school boy frequently grew up to be a flagellant. With us their perversion is intellectual, but it's no less perverse.

---

Sex also shows up in the classroom as academic subject matter -- sanitized and abstracted, thoroughly divorced from feeling. You get "sex education" now in both high school and college classes; everyone determined not to be embarrassed, to be very up-to-date. These are the classes for which sex, as Feiffer puts it "can be a beautiful thing if properly administered." And, then of course, there's still another depressing manifestation of sex in the classroom: the "off-color" teacher, who keeps his class awake with sniggering sexual allusions, obscene titters and academic innuendo. The sexuality he purveys, it must be admitted, is at least better than none at all.

What is missing, from kindergarten to graduate school, is honest recognition of what's happening -- turned-on awareness of what's underneath the pettipants, chinos and the flannels. It's not that sex needs to be pushed in school; sex is pushed enough. But we should let it be, where it is and like it is. As things now stand, students are psychically castrated or spayed -- and for the very same reason that black men are castrated in Georgia: because they are a threat.

So you can add sexual repression to the list of causes, along with vanity, fear and will to power, that turn the teacher into Mr. Charlie. You might also want to keep in mind that he was a nigger once himself and has never really gotten over it. And there are more causes, some of which are better described in sociological than in psychological terms. Work them out, it's not hard. But in the mean time what we've got on our hands is a whole lot of niggers. And what makes this particularly grim is that the student has less chance than the black man of getting out of his bag. Because the student doesn't know he's in it. That, more or less, is what's happening in higher education. And the results are staggering.

For one thing down little education takes place in the schools. How could it? You can't educate slaves; you can only train them. Or, to use an uglier and more timely word, you can only program them.

I like to folk dance. Like other novices I've gone to the Intersection or to the Museum and laid out good money in order to learn to dance. No grades, no prerequisites, no separate dining rooms, they just turn you on to dancing. That's education. Now look at what happens in college. A friend of mine, Milt, recently finished a folk dance class. For his final he had to learn things like this: "The Irish are known for their wit and imagination, qualities reflected in their dances, which include the jig, the reel and the hornpipe." And then the teacher graded him A,B,C,D, or F; while he danced in front of her. That's not education. That's not even training. That's an abomination on the face of the earth. It's especially ironic because Milt took that dance class trying to get out of the academic rut. He took crafts for the same reason. Great, right? Get your hands in some clay? Make something? Then the teacher announced that a 20 page term paper would be required -- with footnotes.

At my school we even grade people on how they read poetry. That's like grading people on how they fuck. But we do it. In fact, God help me, I do it. I'm the Simon Legree of the poetry plantation. "Tote that iamb! Lift that spondee" Even to discuss a good poem in that environment is potentially dangerous because the very classroom is contaminated. As hard as I may try to turn students on to poetry, I know that the desks, the texts, the IBM cards, their own attitudes toward school and my own residue of UCLA method are turning them off.

Another result of student slavery is just as dangerous -- students don't get emancipated when they graduate. As a matter of fact, we don't let them graduate until they've demonstrated their willingness -- over 16 years -- to remain slaves. And for important jobs, like teaching, we make them go through more years just to make sure.

What I'm getting at is that we're all more or less niggers and slaves, teachers and students alike. This is the fact you have to start with in trying to understand wider social phenomena, say, politics, in our country and in other countries.

CONTINUED on PAGE THREE

The oink staff feels that connecting parts of this article (or any article) would detract from the author's intended effectiveness therefore it is printed intact. If you are offended, tuff weaper.

out of Viet Nam now!

# oink PAGE THREE EAT 'EM

## answer to an anonymous letter

(IN FUTURE ISSUES of oink! WE WILL GREATLY EXPAND ON THE IDEAS EXPOUNDED BELOW)

" Dear Student Body President—
What have you done for us so far besides these so-called "funny" announcements?"

Approximately two weeks ago that unsigned note was posted on the bulletin board outside S-1. The following is an attempt to explain why Student Council has thus far failed to do anything of any consequence (Well golly gee, I think Homecoming was really neatojet).

First of all, you must realize that the lack of action stems from the way in which Student Council is set up. We work according to the rules and regulations set up by the Administration; or, as the "Liberal" Establishment exhorts us to, we work "within the system." To work in that capacity is to accept compromises and a Supreme Authority, which we have done. It also means that it is very hard to make any changes. The Administration is so scared to give approval to something that might annoy a small minority, that we cannot even ask whether something should be done. For example: On Oct. 22, in discussing a questionnaire that perhaps someday will be distributed amongst you students, Mr. Shiney refused to allow the Student Council to ask the following question—

"Information regarding rights and obligations under the Selective Service System (the draft) should be made available to:
___ Senior boys only
___ All boys
___ All students
___ No students
___ Other_____ "

No program or activity was proposed. We were only asking if a need for one existed. We were only asking a question. But we can't do that.

And so it goes on. We are sealed in by tradition, subordination, red tape, and worst of all, by bad, bad, vibrations. We can only promise you that we will continue on in our trek into the Student Government Jungle. It does not sound too optimistic, but at this point, we aren't.

I TOLD, TAKE YOUR CLOTHES OFF — COMPANY IS COMING!

Quote

Those who profess to favor freedom yet deprecate agitation are men who want crops without plowing up the ground; they want rain without thunder and lightning. They want the ocean without the awful roar of its many waters.
...Power concedes nothing without demand. It never did and it never will. Find out just what any people will quietly submit to and you have found out the exact measure of injustice and wrong which will be imposed upon them, and these will continue till they are resisted with words or blow, or with both. The limits of tyrants are prescribed by the endurance of those whom they oppress.

Frederick Douglass
August, 1857

[A726]

---

may i feel said he
(i'll squeal said she
just once said he)
it's fun said she

(may i touch said he
how much said she
a lot said he)
why not said she

(let's go said he
not too far said she
what's too far said he
where you are said she)

may i stay said he
(which way said she
like this said he
if you kiss said she

may i move said he
it is love said she)
if you're willing said he
(but you're killing said she

but it's life said he
but your wife said she
now said he)
ow said she

(tiptop said he
don't stop said he)
oh no said he)
go slow said she

(cccome? said he
umm said she)
you're divine! said he
(you are Mine said she)

— ee cummings 100 poems

TO WHOM IT MAY CONCERN

I want to billow
in your thighs
The sweet havoc
To burst beautiful
A moment in you

— mason williams

---

## STUDENT & NIGGER CONTINUED

Educational oppression is trickier to fight than racial expression. If you are a black rebel they can't exile you; they either have to intimidate you or kill you. But in high school or college, they can bounce you out of the fold. And they do.

Rebel students and renegade faculty members get smothered or shot down with devastating accuracy. In high school, it's usually the student who gets it; it's more often the teacher in college. Others get tired of fighting and voluntarily leave the system. But dropping out of college for a rebel, is a little like going North for a Negro. You can't really get away from it, so you might as well stay and raise hell.

How do you raise hell? That's another article. But for a start,'why not stay with the analogy? What have black people done? They have, first of all, faced the fact of their slavery. They've stopped kidding themselves about an eventual reward in the Great Watermelon Patch in the sky. They have organized. They've decided to get freedom now, and they've started taking it.

Students, like black people, have immense unused power. They could theoretically, insist on participating in their own education. They could teach their teachers to thrive on love and admiration rather than on fear and respect, and to a lay down their weapons. Students could discover community. And they could learn to dance by dancing on the IBM cards. They could make colouring books out of the catalogs and they could put the grading system in a museum.

They could raze one set of walls and let life come blowing into the classroom: They could turn the classroom into a "field of action" as "ater Marin describes .t. And they could study for the best of all reasons — their own resources.

They could. They have the power. But only in a very few places, like Berkeley, have they even begun to think about using it. For students, it isn't with Mr. Charlie. It's with what Mr. Charlie has done to your mind. THE END

Writing, subversive activities, assorted weird stuff, antics, mayhem, etc...
BILL SCHAFFNER
Artwork, Layout, snide remarks, sarcasm, organizing, vigilante groups, et al....
DAVID K.Y. BAKER

# THE ANTI—WAR MAJORITY IS MARCHING

## NOV. 15, 1969

TO
BRING
ALL TROOPS
HOME
NOW

CO-CHAIRMEN OF THE
*NEW MOBILIZATION COMMITTEE*

Mrs. Martin Luther King, Jr.
Dr. Benjamin Spock
Reverend William Sloane Coffin

Stewart Meacham - American Friends Service
Committee
Douglas Doud - Professor, Economics, Cornell
University
Donald Kalish - Professor, UCLA
Sidney Lens - Chicago Writer and Labor
Authority
Cora Weiss - Women's Strike For Peace
Sidney Peck - Professor, Sociology - Case
Western Reserve University
David Dellinger - Editor of "Liberation"
Magazine

printed by
TEC–ART & PEACE PRESS......
a group of people very much involved.

• NEW MOBILIZATION COMMITTEE
OFFICES

[A727]

Los Angeles 555 No. Western Ave., 90004
Phones: 462-0577 — 462-8188 — 463-4448

San Francisco 2170 Bryant St., 94110
Phone: 285-8660

Washington D.C. 1029 Vermont Ave. N.W.
Phone: 937-9500

Send in this coupon to show your support — and to
make bus or auto passenger reservations.

☐ I would like to help, please contact me.
Please send price list for small or bulk orders
of buttons, leaflets, brochures, posters, bumper
stickers, etc.

Enclosed is $ _____ for _____
☐ Bus reservations
☐ Auto passenger reservations
☐ (Driver determines sharing cost —
if any)
☐ I can't march so please accept my
contribution to help others march.

_____
Name *(please print)*

_____
Address City Zip

_____
Phone School or Organization

*(Make checks payable to The New Mobilization
Committee - Southwest; 555 N. Western Ave.,
Los Angeles, California 90004.)*

We march to give the American majority
an opportunity to demonstrate their opposition
to the war in Vietnam — and to
STOP AGGRESSION abroad —

END OPPRESSION of ethnic minorities —

CEASE REPRESSION of those, PEACEFULLY,

protesting present policies — thus reordering our
National priorities so that
The United States shall have a society
COMMITTED to peace and freedom......

- ■
- ■
- ■

IN SAN FRANCISCO......

250,000 marchers will carry white flags
with black borders. The flags, bearing the
number of persons killed in Vietnam, will be used
to dedicate a portion of Golden Gate Park to those
sacrificed in this barbaric war.

- ■
- ■
- ■

IN WASHINGTON D.C.......

500,000 people will march. Those killed in
the war will be represented by
50 caskets, one for each state,
filled with cards bearing the names of
the Vietnam war dead.

[A728]

## TRANSPORTATION (from Los Angeles area)

● BUS

Advance reservations required !
Round trip fare —
 School-type seats $10.00
 Reclining seats $15.00
Schedule —
leaving from Valley Peace Center
7105 Hayvenhurst Ave, Van Nuys
(San Diego Frwy.— exit at Sherman Way-West)

leaving (Van Nuys) Fri., 11-14 - 10 pm
arriving, (SF) 11-15 - 7 am

leaving, (SF) Sat., 11-15 - 6 pm
arriving, (LA) 11-16 - 3 am
OR.. leaving, (SF) Sun., 11-16 - 11 am
arriving, (LA) Sun., 11-16 - 8 pm

*RESERVATIONS — Send checks payable to
NEW MOBILIZATION COMMITTEE
555 No. Western Ave. LA 90004

DEADLINE FOR RESERVATIONS
Nov. 10 - noon.

● AUTO

If you're driving and have room
for passengers or, if you need a ride,
call Transportation Central — 787-6925,
(San Fernando Valley Peace Center).
Evenings: 397-3622 or 661-9554.

Orange County (714) 836-8669
Long Beach 433-4381
San Diego (714) 488-7686
San Bernardino (714) TU 5-3132
Ontario (714) 986-4861

Space is available for those wishing to
leave cars at Transportation Central.

*— Use coupon on this brochure

## TRANSPORTATION (cont'd.)

● AIRPLANE

Make your own reservations NOW to SF.
Chartered Jet to WASHINGTON, D.C. —
ROUND TRIP. $190.00
leaving, (LA) Thurs., 11-13 - am
returns, (LA) Sat., 11-15 - pm
WRITE:
 American Friends Service Comm.
 Box 991
 Pasadena, Calif. 91102
 Phone: 681-7651

● SAN FRANCISCO MARCH & RALLY

Marchers may join the march at any time.
The three assembly points are:

7:30 am — Pier 29 - Sansom St.
 The Embarcadero

8:00 am — 18th & Dolores
 Misson Dolores Park

10:00 am — Geary & Steiner
 Hamilton Park

( 4 miles down Geary St. to the
 Polo Grounds)

2:00 pm — Polo Grounds Rally
 Golden Gate Park.

THIS NOV. 15th MARCH IS PART OF A
CONTINUING PEACE EFFORT WHICH
WILL NOT STOP
UNTIL THE
WAR IS OVER !