Donna THOMAS, John Tiedeman, by and through his parents Mr. & Mrs. Henry Tiedeman, David Jones, by and through his parents Mr. & Mrs. John E. Jones, Richard Williams, by and through his parents Mr. & Mrs. Arthur F. Williams, Plaintiffs-Appellants,

v.

BOARD OF EDUCATION, GRANVILLE CENTRAL SCHOOL DISTRICT, William E. Butler, Don L. Miller, Frederick J. Reed, Beverly Tatko, Robert L. Flower, Terry M. Knipes, Walter Perry, III, Frank P. Villano, Donald Binck, Marie Vanderminden, and Theresa McCauliffe, each Individually and in their official capacities, Defendants-Appellees.

No. 142, Docket 79-7382.

United States Court of Appeals, Second Circuit.

Argued Sept. 6, 1979.

Decided Oct. 15, 1979.

Richard Emery, New York City, New York Civil Liberties Union, for plaintiffs-appellants.

H. Wayne Judge, Glens Falls, N.Y., Caffrey, Pontiff, Stewart, Rhodes & Judge, Glens Falls, N.Y., for defendants-appellees.

Before KAUFMAN, Chief Judge, and NEWMAN and KEARSE, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

Public education in America enables our nation's youth to become responsible participants in a self-governing society. To perform this critical function effectively, professional educators must be accorded substantial discretion to oversee properly their myriad responsibilities. But our willingness to defer to the schoolmaster's expertise in administering school discipline rests, in large measure, upon the supposition that

the arm of authority does not reach beyond the schoolhouse gate. When an educator seeks to extend his dominion beyond these bounds, therefore, he must answer to the same constitutional commands that bind all other institutions of government. Where, as in the instant case, school officials bring their punitive power to bear on the publication and distribution of a newspaper off the school grounds, that power must be cabined within the rigorous confines of the First Amendment, the ultimate safeguard of popular democracy. We hold that these limits have been exceeded in the case before us.

## I

Granville is a small, rural community located some sixty miles north of Albany, in upstate New York. In this quiet town, Donna Thomas, John Tiedeman, David Jones, and Richard Williams, all students in the Granville Junior-Senior High School,[1] conceived a plan in November 1978 to produce a satirical publication addressed to the school community. As their project evolved in succeeding months, the students decided to emulate *National Lampoon*, a well-known publication specializing in sexual satire. After soliciting topics from their fellow students, the editors drafted articles pasquinading school lunches, cheerleaders, classmates, and teachers. Articles on masturbation and prostitution as well as puzzles and a cartoon were also prepared. Some of the initial preparation for publication occurred after school hours in the classroom of a Granville teacher, George Mager. Intermittently, the students conferred with Mager for advice on isolated questions of grammar and content. At most, it appears that only an occasional article was composed or typed within the school building, always after classes. Apart from these scant and insignificant school contacts, however, they worked exclusively in their homes, off campus and after school hours.

In mid-January, Mager first noticed a draft of an article in the students' papers and immediately informed Granville's Assistant Principal, Frederick Reed, of his discovery. Shortly thereafter, Reed summoned Tiedeman and discussed with him the "dangers" of publishing material that might offend or hurt others. Specifically, he told Tiedeman that a similar publication several years before had culminated in the suspension of the students involved. Accordingly, Reed cautioned Tiedeman to refrain from mentioning particular students and to keep the publication off school grounds.

In response to Reed's admonition, Tiedeman and his young associates deleted several proposed articles and excised students' names from others. Moreover, they assiduously endeavored to sever all connections between their publication and the school. A legend disclaiming responsibility for any copies found on school property was affixed to the newspaper's cover. Indeed, all 100 copies of the paper were produced by the facilities of a community business. Once completed, the publication was stored, with Mager's permission, in his classroom closet. At the end of each school day, the students retrieved a number of copies and sold each one for twenty-five cents to classmates[2] at Stewart's, a store in Granville. Within a week, all but seven copies were sold, and receipts totalled $11 to $13.

The publication, entitled *Hard Times*,[3] first surfaced within the school on January 24 when a teacher confiscated a copy from a student and presented it to Granville's principal, William Butler. Butler and Don

---

1. Approximately 1100 children attend Granville Junior-Senior High School, ranging in age from eleven to eighteen, in grades seven through twelve. The four appellants were all Senior High School students.

2. The editors sold their paper to older classmates, refusing to dispense it to junior high school students. Indeed, Judge Foley subsequently found there was no evidence that sev-

enth and eighth graders ever secured copies of the newspaper.

3. The paper's contents are aptly described by the banner across its cover as "uncensored, vulgar, immoral." Its thirteen pages are saturated with distasteful sexual satire, including an editorial on masturbation and articles alluding to prostitution, sodomy, and castration.

Miller, Superintendent of Schools, initially agreed to take no action, at least until they could assess the publication's impact. On January 24 and 25, schoolwide examinations were conducted without incident, demonstrating the soundness of their initial decision. Subsequently, however, Beverly Tatko, President of the Granville Board of Education, learned of the paper's existence through her son, Peter. Shocked and offended, Tatko met with Miller and Butler on January 29 to ascertain how the school officials intended to proceed. Moreover, Tatko intimated her dissatisfaction with the administrators' inaction, and suggested convening a school board meeting to discuss the episode. Immediately Butler instituted an investigation. Mager, surrendering the seven remaining copies deposited for storage in his closet, informed Butler of his limited role in the paper's composition. Moreover, the principal determined that the four appellants were primarily responsible for publication and dissemination of the paper. Miller then telephoned each of the students' parents and invited them to attend a school board meeting that evening.

At the meeting, Butler summarized the results of his investigation and distributed copies of the publication. Later, Miller and Butler, following consultation with the Board of Education, decided to impose a number of penalties: (1) five-day suspensions to be reduced to three days if the student prepared an essay on "the potential harm to people caused by the publication of irresponsible and/or obscene writing"; (2) segregation from other students during study hall periods, throughout the month of February and possibly longer if an acceptable essay were not submitted; (3) loss of all student privileges during the period of suspension; and (4) inclusion of suspension letters in the students' school files. These sanctions took effect on February 1, when Butler personally informed each student of the punishment and then telephoned their

parents to explain the decision. At the same time, he prepared a letter to the parents describing *Hard Times* as "morally offensive, indecent, and obscene," and outlining the penalties imposed.

On February 6, the students brought this suit under 42 U.S.C. § 1983 in the Northern District of New York seeking injunctive and declaratory relief from alleged deprivations of their First and Fourteenth Amendment rights. The Granville Board of Education, Butler, Miller, Reed, Tatko, and the other individual board members were named as defendants. That very day, Judge Foley heard oral argument on the plaintiffs' application for an order temporarily restraining all punishment. The able district court judge enjoined the essay requirement,[4] but otherwise denied the requested relief pending a hearing on the students' motion for a preliminary injunction pursuant to Fed.R.Civ.P. 65. Thus the students had served their full five-day suspensions before Judge Foley heard argument on their request for preliminary injunctive relief. When the hearing finally was held on February 21,[5] the parties called twelve witnesses to explain the events relating to the students' suspensions. In addition, both sides submitted affidavits to assist the court in gauging the paper's likely impact upon Granville's students. Defendants' experts, three school administrators from neighboring towns, predicted in their affidavits a "devastating" effect on public education, whereas plaintiffs' expert, an education professor, asserted in his affidavit that "no competent school administrator" would claim that *Hard Times* would disrupt the educational process of high school students.

Judge Foley denied plaintiffs' motion on May 2, ruling there had been an insufficient showing of likely success on the merits to warrant a preliminary injunction. In support of this conclusion, he noted that Beverly Tatko's professed "shock" at the paper's

4. In granting injunctive relief from the essay requirement, Judge Foley noted that the Supreme Court itself has experienced much difficulty in writing on the question of "irresponsible and/or obscene" expression.

5. One day before the hearing, plaintiffs filed an amended complaint in which they abandoned their procedural due process claims.

contents, together with *post hoc* forecasts of possible disruption in the affidavits of defendants' experts, satisfied him that *Hard Times* was potentially destructive of discipline in Granville Junior-Senior High School, and therefore not protected by the First Amendment.[6] Although no school rule specifically governed student publications, the district court judge held that the plaintiffs' activities fell within the scope of a school regulation adopted pursuant to New York Education Law § 3214, subd. 6(1), authorizing suspension of students who are "insubordinate or disorderly, or whose conduct otherwise endangers the safety, morals, health or welfare of others."

The district court later consolidated the proceedings on the merits, and denied the plaintiffs' request for a permanent injunction. The plaintiffs have filed timely appeals from the orders denying both temporary and permanent relief.[7]

## II

The proper resolution of this appeal requires us to measure the sanctions imposed by Granville school officials against the yardstick of our constitutional commitment to robust expression pursuant to the First Amendment. It is appropriate, therefore, to review the fundamental principles that buttress our deeply held preference for free discourse over enforced silence, fully mindful of Judge Newman's concurring opinion.

### A.

At the heart of the First Amendment is the ineluctable relationship between the free flow of information and a self-governing people, and courts have not hesitated to remove the occasional boulders that obstruct this flow. *See, e. g., Garrison v. Louisiana,* 379 U.S. 64, 74–75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); *Edwards v. National Audubon Society, Inc.,* 556 F.2d 113, 115 (2d Cir.), *cert. denied,* 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977); Kalven, *The New York Times Case: A Note on "The Central Meaning of the First Amendment,"* 1964 Sup.Ct.Rev. 191, 193–94. Embodied in our democracy is the firm conviction that wisdom and justice are most likely to prevail in public decisionmaking if all ideas, discoveries, and points of view are before the citizenry for its consideration. *See, e. g., Abrams v. United States,* 250 U.S. 616, 630, 40 S.Ct. 17, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting); *United States v. Associated Press,* 52 F.Supp. 362, 372 (S.D. N.Y.1943) (L. Hand, J.), *aff'd,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945). Accordingly, we must remain profoundly skeptical of government claims that state action affecting expression can survive constitutional objections.

At the same time, we have frankly recognized that not all expression enlightens the body politic, and that some words are capable of perpetrating grievous harm. Thus, when experience has clearly revealed that the value of a species of expression is thoroughly exiguous, but its potential for harm is great, courts have defined narrow categories of words that the state may pun-

---

**6.** Judge Foley also found that some of the composition and ultimately storage of the newspaper had occurred in school, and that there was "some evidence some issues may have been sold" on school grounds. *But see* note 12 *infra.*

**7.** On May 21, plaintiffs moved the district court for a final injunction or, in the alternative, consolidation on the merits pursuant to Fed.R. Civ.P. 65(a)(2). Thereafter, plaintiffs filed a notice of appeal pursuant to Fed.R.App.P. 3(a). Although uncertain whether the notice of appeal worked to divest him of jurisdiction to entertain the May 21 motion, Judge Foley ordered the proceedings consolidated on the merits and denied plaintiffs' motion for a permanent injunction.

Although filing of a timely notice of appeal in the district court normally divests that court of further jurisdiction, an appeal from an interlocutory order granting or denying preliminary injunctive relief does not strip the district court of jurisdiction to proceed with the action on the merits. *Ex parte National Enameling & Stamping Co.,* 201 U.S. 156, 162, 26 S.Ct. 404, 50 L.Ed. 707 (1906); 9 Moore's Federal Practice ¶ 203.11 (2d ed. 1975). Accordingly, the district court retained jurisdiction to deny the permanent injunction following plaintiffs' May 23 notice of appeal. We shall thus treat the appeal as one from the denial of a permanent injunction.

ish. *See, e. g., Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 340, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). In this manner, we have excluded libel, obscenity, and incitement from the First Amendment's protective cloak. *See, e. g., New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969).

In defining these limited enclaves of unprotected speech, however, we have taken great pains to preserve ample breathing space in which expression may flourish. *See New York Times Co. v. Sullivan, supra,* 376 U.S. at 271–72, 84 S.Ct. 710 (citing *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)). Indeed, we have granted First Amendment protection to much speech of questionable worth, rather than force potential speakers to determine at their peril if words are embraced within the protected zone. To avoid the chilling effect that inexorably produces a silence born of fear, we have been intentionally frugal in exposing expression to government regulation.

█ Moreover, the subtle calculus we employ to weigh the quantum of chilling effect a free people can tolerate rests upon a fundamental axiom—speech may not be suppressed nor any speaker punished unless the final determination that specific words are unprotected is made by an impartial, independent decisionmaker. *See, e. g., Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 561, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975); *Freedman v. Maryland,* 380 U.S. 51, 58, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 66, 83 S.Ct. 631, 9 L.Ed.2d 584 (1953). We recognize the realities of life. Thus, when those charged with evaluating expression

have a vested interest in its regulation, the temptation to expand the otherwise precise and narrow boundaries of punishable speech may prove irresistible. Further, a cautious expositor of controversy may well choose silence over expression if he knows that his words will be judged by a decisionmaker predisposed to rule against him. Accordingly, the caselaw explicating the limits of governmental authority over expression counsels, both implicitly and explicitly, that the constitutional status of speech be determined by the judiciary, the one institution of government intentionally designed to render dispassionate justice. *See, e. g., Southeastern Promotions, Ltd., supra,* 420 U.S. at 560–62, 95 S.Ct. 1239; *Freedman, supra,* 380 U.S. at 57–60, 85 S.Ct. 734; *Bantam Books, Inc., supra,* 372 U.S. at 68–70, 83 S.Ct. 631. *See generally,* Monaghan, *First Amendment "Due Process,"* 83 Harv.L.Rev. 518 (1970).[8] In the community-at-large, therefore, the First Amendment dictates that, in cases involving expression, no prior restraint be enforced and no subsequent punishment be inflicted absent the considered approbation of an independent adjudicator. *Cf.* Kaufman, *Chilling Judicial Independence,* 88 Yale L.J. 681, 681–83 (1979).

### B.

█ These principles presuppose a democratic and free society. Yet we recognize that granting the fullest measure of individual freedom in every corner of the polity would, in certain settings, necessarily obstruct fulfillment of vital social functions. Accordingly, although soldiers and prisoners, for example, enjoy many First Amendment privileges, it is beyond cavil that their rights of expression may be curtailed in a manner that would be intolerable in the outside community. *See, e. g., Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974).[9] Yet,

8. We recognize, of course, that these cases arose in the context of prior restraints on expression. Nevertheless, the principles they expound also illuminate the resolution of cases involving subsequent punishment. This is all the more true in informal administrative settings such as we are faced with here. *See* Part III *infra.*

9. Where practicable, courts have required the state to make clear the classes and methods of expression which it deems irreconcilable with a

even in these isolated archipelagos, the Constitution requires government authorities to permit the maximum degree of unrestrained expression consistent with the maintenance of institutional integrity. Moreover, since First Amendment freedoms beyond these institutions are jealously guarded, the more stringent restrictions acceptable within them will in no wise inhibit expression in the larger community.

Nowhere is this delicate accommodation more vital than in our nation's schools. Obviously, education would be impossible if teachers were forbidden to sanction incorrect responses or substandard essays with failing grades. Realistically, our children could not be educated if school officials supervising pre-college students were without power to punish one who spoke out of turn in class or who disrupted the quiet of the library or study hall.

These cases, therefore, are not easy of solution and much depends on the specific facts before us. For example, we have consistently maintained that students and teachers enjoy significant First Amendment rights even within the school itself. Thus, in *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), the Supreme Court held that a student could not be forced to salute the American flag against his will. Moreover, in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), the Court ruled that the First Amendment rights of students were abridged when school officials punished them for wearing black armbands in symbolic protest of the Vietnam War. And in a subsequent armband case, *James v. Board of Education*, 461 F.2d 566 (2d Cir.), *cert. denied*, 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 491 (1972), we applied *Tinker* to invalidate the discharge of a public school teacher.

■ But even the *Tinker* line of cases recognizes that expression in school may be curtailed if it threatens to "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." *Tinker, supra,* 393 U.S. at 509, 89 S.Ct. at 738. Moreover, school officials must have some latitude within the school in punishing and prohibiting ordinarily protected speech both out of regard for fellow students who constitute a captive audience, and in recognition of the fact that the school has a substantial educational interest in avoiding the impression that it has authorized a specific expression. Thus, in *Trachtman v. Anker*, 563 F.2d 512, 516 (2d Cir. 1977), *cert. denied*, 435 U.S. 925, 98 S.Ct. 1491, 55 L.Ed.2d 519 (1978), we upheld the action of high school officials who refused to permit distribution of a sexually explicit questionnaire within the school.[10]

Perhaps the most useful illustration of the delicate balance we have endeavored to strike between institutional needs and individual rights is our decision in *Eisner v. Stamford Board of Education*, 440 F.2d 803 (2d Cir. 1971). There we confronted a school board policy that prohibited the distribution of "any printed or written matter" within the school without the prior approval of school administrators. *Id.* at 805. In the adult world, of course, this policy would have succumbed to our heavy presumption against prior restraints. *See Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931); *New York Times Co. v. United States*, 403 U.S. 713, 714, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). Yet, because we recognized the unique requirements of the educational process, we declined to hold that a system of prior re-

specific institutional setting. *See Cohen v. California*, 403 U.S. 15, 19, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). *But see Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); note 13 *infra*.

**10.** We have also recognized that school officials can, consistent with the First Amendment, select volumes for inclusion in the school li-

brary. *See Presidents Council v. Community School Board*, 457 F.2d 289 (2d Cir.), *cert. denied*, 409 U.S. 998, 93 S.Ct. 308, 34 L.Ed.2d 260 (1972). Thus, in at least some circumstances, school officials can, in accord with the Constitution, deem specific publications unsuitable, a power obviously denied to most public officials. *See id.* at 292.

straint is presumptively unconstitutional. *Eisner, supra,* 440 F.2d at 805. Rather, we interpreted the First Amendment to require that the review process function expeditiously, ensuring that students could swiftly challenge in a judicial forum an adverse administrative decision. *Id.*[11] Thus, we accommodated our concern for the First Amendment rights of students with a cautious deference to the expertise of educational officials within the academic environment.

### III

The case before us, however, arises in a factual context distinct from that envisioned in *Tinker* and its progeny. While prior cases involved expression within the school itself, all but an insignificant amount of relevant activity in this case was deliberately designed to take place beyond the schoolhouse gate. Indeed, the appellants diligently labored to ensure that *Hard Times* was printed outside the school, and that no copies were sold on school grounds. That a few articles were transcribed on school typewriters, and that the finished product was secretly and unobtrusively stored in a teacher's closet do not alter the fact that *Hard Times* was conceived, executed, and distributed outside the school. At best, therefore, any activity within the school itself was *de minimis.*[12]

Thus, the limited abrogation of First Amendment guarantees appropriate in *Trachtman* and *Eisner* is wholly out of place here for in those cases all activities were conducted on school property. Here, because school officials have ventured out of the school yard and into the general community where the freedom accorded expression is at its zenith, their actions must be evaluated by the principles that bind government officials in the public arena. Thus, wholly apart from the ultimate constitutional status of the words employed, these punishments could only have been decreed and implemented by an independent, impartial decisionmaker. Because the appellees do not satisfy this standard, we find that the punishments imposed here cannot withstand the proscription of the First Amendment.[13]

11. Because we feared the substantial intrusion into the educational process that would accompany a requirement that school officials seek judicial review before prohibiting distribution of a student publication, *see Eisner, supra,* 440 F.2d at 810, we implicitly relied on the students themselves to challenge an unconstitutional restraint in court. Indeed, student actions under 42 U.S.C. § 1983 have become a potent vehicle for the vindication of First Amendment rights within the school. *See, e. g., Papish v. Board of Curators,* 410 U.S. 667, 93 S.Ct. 1197, 35 L.Ed.2d 618 (1973); *Tinker, supra.* We have not, however, been content to compel citizens in the general community to suffer punishment prior to judicial review of its propriety. *See* Part IIA, *supra.*

12. It may be suggested that appellants' sparse on-campus conduct constituted insubordination, a basis for discipline wholly independent of the students' off-campus expression. *See N.Y. Educ. Law* § 3214, subd. 6(1). Indeed, we note that Judge Foley concluded that the students' conduct could be punished as insubordination. The official suspension letter sent to the students' parents, however, clearly indicated that appellants' suspensions were premised upon their publication of an allegedly "morally offensive, indecent, and obscene" tabloid, not acts of insubordination. Where First Amendment rights are involved, we are obliged to make an independent and careful examination of the record before us. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 285, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

Moreover, we recognize, as does Judge Newman, that throughout the judicial proceedings in this case, appellees have consistently disclaimed any desire to punish students for off-campus expression. Nevertheless, by premising the imposition of discipline on their evaluation of the content of an off-campus publication rather than on in-school conduct, appellees have, perhaps inadvertently, overstepped the boundary line they claim to have created.

13. Our ground for decision makes it unnecessary to address appellants' assertion that school officials are powerless to inflict punishment unless they promulgate detailed regulations governing student expression. *See Shanley v. Northeast Independent School District,* 462 F.2d 960, 976–77 (5th Cir. 1972). We declined a similar invitation in *Eisner, supra,* 440 F.2d at 804–06. Indeed, it is arguable that, as a practical matter, expression is more likely to be inhibited than encouraged if courts were to require schools to adopt regulations limiting speech. Moreover, such a requirement might unnecessarily contravene our oft-articulated deference to the discretion of school officials. *See Tinker, supra,* 393 U.S. at 507, 89 S.Ct. 733; *James, supra,* 461 F.2d at 568.

We may not permit school administrators to seek approval of the community-at-large by punishing students for expression that took place off school property. Nor may courts endorse such punishment because the populace would approve. The First Amendment will not abide the additional chill on protected expression that would inevitably emanate from such a practice. Indeed, experience teaches that future communications would be inhibited regardless of the intentions of well meaning school officials. *Cf. Eisner, supra,* 440 F.2d at 808.

In the last analysis, a school official acts as both prosecutor and judge when he moves against student expression. His intimate association with the school itself and his understandable desire to preserve institutional decorum give him a vested interest in suppressing controversy. Accordingly, "Under the guise of beneficent concern for the welfare of school children, school authorities, albeit unwittingly, might permit prejudices of the community to prevail." *James, supra,* 461 F.2d at 575; *accord, Shanley v. Northeast Independent School District,* 462 F.2d 960, 966 (5th Cir. 1972). We note, in this connection, that Granville school administrators failed to discipline the appellants until urged to do so by a community leader, Board of Education President Tatko. Although we are resigned to condone an added increment of chilling effect when school officials punish strictly limited categories of speech within the school, we reject the imposition of such sanctions for off-campus expression.

■ It is not difficult to imagine the lengths to which school authorities could take the power they have exercised in the case before us. If they possessed this power, it would be within their discretion to suspend a student who purchases an issue of *National Lampoon,* the inspiration for *Hard Times,* at a neighborhood newsstand and lends it to a school friend.[14] And, it is conceivable that school officials could consign a student to a segregated study hall because he and a classmate watched an X-rated film on his living room cable television. While these activities are certainly the proper subjects of parental discipline, the First Amendment forbids public school administrators and teachers from regulating the material to which a child is exposed after he leaves school each afternoon. Parents still have their role to play in bringing up their children, and school officials, in such instances, are not empowered to assume the character of *parens patriae.*[15]

The risk is simply too great that school officials will punish protected speech and thereby inhibit future expression. In addition to their vested interest and susceptibility to community pressure, they are generally unversed in difficult constitutional concepts such as libel and obscenity.[16] Since superintendents and principals may act "arbitrarily, erratically, or unfairly," *Eisner, supra,* 440 F.2d at 809, the chill on expression is greatly exacerbated. Indeed, while Granville officials staunchly maintained

---

We also need not determine whether *Hard Times* is obscene. Judge Foley did not reach this claim below, but appellees reiterated at oral argument that they have not abandoned it. Nevertheless, because we hold that school officials are powerless to impose sanctions for expression beyond school property in this case, we are spared the task of venturing into the pornography thicket. Accordingly, we need not examine the content of the publication before us.

14. There is evidence in the record that Stewart's, the local store at which *Hard Times* was distributed, also regularly sold *National Lampoon* to Granville students.

15. In fact, contemporary scholarship has been severely critical of excessive state involvement in essentially family affairs as a matter of pub-

lic policy. *See e. g.,* Institute of Judicial Administration—American Bar Association, *Juvenile Justice Standards Project, Standards Relating to Non-criminal Misbehavior* 12 (Tent. Draft 1977).

16. This understandable lack of sophistication in constitutional litigation is amply illustrated in the record before us. In the official letter to appellants' parents explaining their actions, school officials earnestly claimed that their power to punish rested on the fact that *Hard Times* was "morally offensive, indecent, and obscene." Apparently, the appellees believed these three descriptive words to be virtually synonymous, and, therefore, of equivalent legal significance.

that *Hard Times* is obscene, there is no evidence they ever consulted the constitutional standard embodied in *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), and *Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), before suspending the appellants.

Moreover, we cannot overlook the fact that the short duration of most sanctions imposed by school officials—*e. g.,* a five-day suspension—insulates the entire process from effective review. *See Southeastern Promotions, Ltd., supra,* 420 U.S. at 562, 95 S.Ct. 1239; *Freedman, supra,* 380 U.S. at 57, 85 S.Ct. 734. Where, as here, the punishment is virtually terminated before judicial review can be obtained, many students will be content to suffer in silence, a silence that may stifle future expression as well. Further, although students must absorb considerable expense to challenge a suspension in court, school officials can mete out punishment without incurring the costs of procedural safeguards a conventional prosecution would require. *See Bantam Books, Inc., supra,* 372 U.S. at 70, 83 S.Ct. 631; *Monaghan, supra,* at 543. Accordingly, students are not only less likely to challenge a punishment, but the state—in the person of school officials—can more easily "prosecute" than if they proceeded through the judicial process. The chilling effect, therefore, is intensified because the promise of judicial review is virtually an empty one.

In a system of free expression premised in part on the availability of an impartial arbiter, such an unreviewable sanction must be confined to a rigidly restricted area. When school officials are authorized only to punish speech on school property, the student is free to speak his mind when the school day ends. In this manner, the community is not deprived of the salutary effects of expression, and educational authorities are free to establish an academic environment in which the teaching and learning process can proceed free of disruption. Indeed, our willingness to grant school officials substantial autonomy within their academic domain rests in part on the confinement of that power within the metes and bounds of the school itself. *See Eisner, supra,* 440 F.2d at 808; *Shanley, supra,* 462 F.2d at 966.[17]

## IV

On the record before us, we are unable to ascertain the current status of the sanctions imposed against these students. Moreover, we are uncertain of the precise nature of the relief requested.[18] We there-

---

17. We can, of course, envision a case in which a group of students incites substantial disruption within the school from some remote locale. We need not, however, address this scenario because, on the facts before us, there was simply no threat or forecast of material and substantial disruption within the school. Indeed, school officials were content to do nothing at all for six full days, until called to action by the school board president. Even after their investigation, school officials imposed punishment only because they believed *Hard Times* was "morally offensive, indecent, and obscene," not because they feared disruption. No forecast of possible interference with the operation of the school was made until litigation had commenced. The evidence presented by appellees consisted merely of Board President Tatko's professed "shock," and the after-the-fact "predictions" of three school administrators from surrounding communities that *Hard Times* could conceivably imperil academic discipline. These predictions are convincingly repudiated by uncontradicted evidence that Granville Junior-Senior High School continued to operate normally after all but seven of the one hundred copies of *Hard Times* had been sold, and that schoolwide examinations were held without incident. Thus, the school officials' "undifferentiated fear or apprehension of disturbance," *Tinker, supra,* 393 U.S. at 508, 89 S.Ct. at 737, is of no consequence.

18. Specifically, although appellants' amended complaint sought an injunction permitting on-campus distribution of *Hard Times*, they appear to have abandoned this claim on appeal. *See* Brief of Appellants at 51. Thus, we have assumed, for purposes of this opinion, that appellants do not seek to distribute their newspaper on the grounds of Granville Junior-Senior High School. Moreover, if the appellants were to renew their claim, we would require development of a more complete record relating to whether portions of *Hard Times* are unprotected by the First Amendment because they are not suitable for distribution to children in school. *See Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968). Because Judge Foley did not address this issue, we believe it is inappropriate to reach the question for the first time on appeal.

fore express no opinion as to the form of relief that should be granted, but reverse and remand to the district court for further proceedings, consistent with this opinion.

NEWMAN, Circuit Judge, concurring in the result:

The issues in this case concern both off-campus and on-campus distribution of an unofficial student newspaper containing numerous examples of language that is, beyond dispute, indecent, though the publication as a whole may well not be obscene. These issues arise in a case where the school authorities have consistently disclaimed any interest in disciplining students for activity *off* school property and the students have demanded, but not yet exercised, the right to distribute their publication *on* school property.

I concur in the judgment remanding to vacate the sanctions imposed because I agree that school discipline was improperly imposed upon the students for their essentially off-campus activity. The students endeavored to keep their publication and distribution activities off the campus and, for all practical purposes, succeeded. The school authorities had explicitly informed the students that no disciplinary action would be taken if the students kept their publishing activities off school property.

---

Our brother Newman, however, proceeds as if the issue of on-campus distribution is before this court, and that it must be decided in favor of the appellees. Although Judge Newman's analysis is of general interest, we find several aspects of it troubling. Initially, we recognize that *school officials can punish in-school expression by students that would be fully protected in the adult world. See* Part IIB *supra* ; Garvey, *Children and the First Amendment,* 57 'Tex.L.Rev. 321 (1979), We would hesitate, however, to conclude that the obvious need for a flexible application of the First Amendment in the school setting allows educational officials free-wheeling and unbridled discretion to prohibit expression they regard as indecent, even within the narrow confines of the schoolhouse.

Moreover, we have difficulty with Judge Newman's footnote suggesting that school officials can regulate allegedly "indecent" expression by students in the general community. We do not doubt that the state can appropriately legislate a state-wide "variable" standard of obscenity with respect to children, *see Ginsberg, supra,* or that, in some circumstances, expression that is suitable for adults can be suppressed because of its potential effect on children, *see FCC v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978). Nevertheless, we believe that this power is denied to public school officials when they seek to punish off-campus expression simply because they reasonably foresee that in-school distribution may result. If this is to be the standard, we cannot avoid asking if the proprietor of Stewart's, the store adjacent to Granville High School, could be punished by the *Board of Education* for selling the *National Lampoon* so close to the school? Surely, it is "reasonably foreseeable" that the magazine would find its way into the school. Moreover, if the educational interest vindicated by school officials is the need "to promote standards of decency and civility among school children,"

*see* P. 1057 *infra* (Newman, J., concurring), a concept attractive on its face but necessarily elusive if not impossible to apply evenhandedly, it is not apparent why educators would not be permitted to fail a student in an English course for writing a scurrilous letter to the *New York Times.* If the letter *is* composed by a classmate, is it not reasonably foreseeable that fellow students will circulate it within the school? Indeed, if an off-campus publication includes criticism of the school itself, we assume the foreseeability of distribution within the school increases. Thus, in this not infrequent situation, this standard invites school officials "to seize upon the censorship of particular words as a convenient guise for barring the expression of unpopular views." *Cohen v. California,* 403 U.S. 15, 26, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1971).

Equally disturbing is the unavoidable interference with the proper role of parents contemplated by Judge Newman's approach. Both *Ginsberg* and *Pacifica* premise their analysis on a recognition that "the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Ginsberg, supra,* 390 U.S. at 639, 88 S.Ct. at 1280 (quoting *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944)). *Ginsberg* upheld a prohibition on sales of "girlie" magazines to minors because parents could, if they wished, purchase periodicals for their children. In *Pacifica,* a parent complained that unwelcome expression was thrust upon him and his young son. In the instant case, however, a parent who believed *Hard Times* was a harmless prank is powerless to erase his child's suspension, and the child whose parents deemed the paper acceptable reading cannot obtain a copy. Indeed, it is not without significance that the parents of three of the appellants in this case brought suit on behalf of their children.

Whatever notice requirements the Due Process Clause mandates before student discipline may be imposed, see *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) there can be no doubt that discipline imposed exactly contrary to the announced standards of school authorities is constitutionally impermissible.[1] Thus the conclusion that the students were in fact disciplined for off-campus activity suffices to establish that their discipline was imposed in violation of the Fourteenth Amendment.[2] But that is only half the case. Since the students in their amended complaint sought relief entitling them to distribute their publication *on* school property and since the school warned them such activity would incur the risk of punishment, it must also be decided whether the school may regulate the on-campus distribution of the students' publication.[3] That question requires consideration of whether the on-campus distribution of this publication is protected by the First Amendment.

1. In the District Court the students abandoned all contentions that they were denied procedural due process in connection with the disciplinary proceedings themselves. Thus no claim is made that notice of those proceedings was in any way deficient. But there has been no abandonment of the basic due process claim that discipline may not be imposed for off-campus activity when the school had announced its toleration of such activity.

2. In agreeing that the discipline was imposed for activity that, as we assess it, occurred almost entirely off campus, I make no accusation that the school authorities have sought to extend their dominion beyond the school house gate or have ventured into the general community. They have sought to do precisely the opposite, *i. e.*, exercise authority only for on-campus activity. They thought the on-campus activity was significant. We disagree. We are entitled, with constitutional issues at stake, to disagree with their assessment of the facts, but they are entitled to be spared criticism for seeking power they have explicitly disclaimed. In light of the school's announced policy to discipline only for on-campus publication, the discipline imposed in this case is properly vacated for failure of proof.

3. The claim to on-campus distribution has not been abandoned by the appellants in this Court. The conclusion of their brief requests this Court to direct the District Court to grant relief

It is not disputed that the student publication "Hard Times" contains more than isolated examples of language that is, by contemporary standards, indecent and vulgar for school-age children. The pages of the federal reports will not be enriched by their repetition. The students responsible for the publication proudly labeled it "vulgar." This was not false advertising.

There is no question that student expression enjoys First Amendment protection. *Tinker v. Des Moines Independent School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). When school authorities seek to punish the expression of opinion, they must be prepared to demonstrate the existence of facts that might reasonably have led them "to forecast substantial disruption of or material interference with school activities." *Id.* at 514, 89 S.Ct. at 740.[4] In the trial of this case, both sides appeared to assume that the *Tinker* test of a predictable disruption is the standard for regulating not only the expression of views and opinions but also the language used.[5]

requiring the school authorities to "(1) Cease *all* seizures and punishments for student publication unless and until constitutionally adequate guidelines regulating student publications are adopted." (Appellants' Brief 51) (Emphasis added). This requested prohibition against *any* regulation, without prior guidelines, is explicitly stated earlier in the brief to be a demand, as expressed in the amended complaint, to "sell 'Hard Times' on school grounds . . . ." (Appellants' Brief 14). As the brief further states, "Plaintiffs contend that any regulation of their free speech, such as regulation of 'Hard Times' on or off school grounds, must be based on specific written regulations . . . ." *Ibid.* It was this contention that the District Judge rejected when he ruled that plaintiffs are not entitled to the permanent injunction they seek.

4. *Tinker* was concerned with school efforts to regulate the expression of a particular opinion—opposition to the Vietnam War. The case can be read more broadly, but not unreasonably, to protect against regulation of all expressions of opinion.

5. Other courts have applied the *Tinker* test of a predictable disruption to school authorities' attempts to regulate student publications because of the content of the ideas being expressed. *Shanley v. Northeast Independent School District, Bexar County, Texas*, 462 F.2d 960 (5th

Yet nothing in *Tinker* suggests that school regulation of indecent language must satisfy the criterion of a predictable disruption.[6] Two other decisions of the Supreme Court have grappled with the specific issue of regulating indecent language, and the sum of their teaching indicates that the Court would not accord First Amendment protection to indecent language in a student publication distributed to high school students on school property.

In *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), the Court considered the criminal conviction of a protester of the Vietnam War for breaching the peace by offensive conduct. The conduct California sought to punish was the wearing in a courthouse corridor of a jacket bearing the words "Fuck the Draft." The Court invalidated the conviction, finding this use of language protected by the First Amendment. Justice Harlan initially observed that "the First and Fourteenth Amendments have never been thought to give absolute protection to every individual . . . to use any form of address in any circumstances that he chooses." *Id.* at 19, 91 S.Ct. at 1785. Justice Harlan acknowl-

edged that "certain kinds of otherwise permissible speech" need not be "tolerated in certain places," *ibid.*, thereby recognizing the potential applicability of time, place, and manner regulation to indecent language. However, the breach of peace conviction was not upheld as a time and place regulation because the state criminal statute gave no reasonable notice of "distinctions between certain locations." *Ibid.*

*Cohen* also considered the sensitive issue of whether, apart from time, place, and manner regulation, government has any legitimate interest in regulating the public use of indecent language out of concern for the sensibilities of those who might be offended. Though he had previously identified "protecting the sensibilities of passersby" as a state interest worthy of consideration, *Street v. New York*, 394 U.S. 576, 591, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969),[7] Justice Harlan declined to permit this interest to validate Cohen's conviction. This conclusion appears to rest on two different sets of reasons. The first concerns the risks encountered if regulation is permitted on this basis. Plainly concerned about a govern-

Cir. 1972); *Scoville v. Board of Education of Joliet Township High School District 204*, 425 F.2d 10 (7th Cir.), *cert. denied*, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970); *Bayer v. Kinzler*, 383 F.Supp. 1164 (E.D.N.Y.1974), *aff'd without opinion*, 515 F.2d 504 (2d Cir. 1975); *cf. Quarterman v. Byrd*, 453 F.2d 54 (4th Cir. 1971); *Gambino v. Fairfax County School Board*, 429 F.Supp. 731 (E.D.Va.), *aff'd*, 564, F.2d 157 (4th Cir. 1977).

In *Jacobs v. Board of School Commissioners*, 490 F.2d 601, 610 (7th Cir. 1973), *vacated as moot*, 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975), the Seventh Circuit applied the *Tinker* test to the use of questionable language in a student publication, holding 2 to 1 that the publication could not be regulated because of "the occasional presence of earthy words." The decision rested primarily, however, on the vagueness and overbreadth of the challenged regulation.

*Scoville* may also suggest that the *Tinker* standard applies to language in a student publication. The Court observed that "students in high school are not insulated from . . . shocking but legally accepted language . . ." 425 F.2d at 14. However, that decision invalidated discipline administered because of the views expressed in an article urging students to ignore a school pamphlet. An isolated remark

in questionable taste referred to by the Court appeared in another article and does not appear to have been the basis for any school discipline.

6. When Justice Fortas in *Tinker* formulated the predictable disruption test to safeguard a student's expression of an opinion, he was not facing any issue concerning on-campus distribution of indecent language to children. Later, when the Court explicitly upheld state power to punish distribution to children of publications not obscene by adult standards, *Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), Justice Fortas dissented not to protest the adult-child distinction, but only to challenge a penalty imposed without evidence of fault by the distributor. At the same time, the author of *Tinker* made clear that when the buyers are children, "pushers or panderers of vulgar literature" may be punished. *Id.* at 674, 88 S.Ct. at 1298.

7. See also the concern expressed by Justice Powell about "the willful use of scurrilous language calculated to offend the sensibilities of an unwilling audience." *Rosenfeld v. New Jersey*, 408 U.S. 901, 905, 92 S.Ct. 2479, 2481, 33 L.Ed.2d 321 (1972) (Powell, J., dissenting).

ment attempt to "excise . . . one particular scurrilous epithet from the public discourse," 403 U.S. at 22, 91 S.Ct. at 1787, Justice Harlan warned that forbidding particular words runs "a substantial risk of suppressing ideas" or at least lessening the "emotive . . . force . . . of the overall message sought to be communicated." *Id.* at 26, 91 S.Ct. at 1788. He also questioned whether principled distinctions could be made in determining any limit to a governmental power to regulate indecent speech. *Id.* at 25, 91 S.Ct. at 1788. The second set of reasons focused on the choices available to members of the public. For most, the choice of "averting their eyes" was apparently sufficient. *Id.* at 21, 91 S.Ct. 1780. If there were those "powerless to avoid" the epithet on Cohen's jacket, they had the choice of indicating their objection, and Justice Harlan suggested that evidence of such objection might justify regulation, at least under a statute evincing special concern with the plight of the captive listener or viewer. *Id.* at 22, 91 S.Ct. 1780.

In *Federal Communications Commission v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), the Court again considered the public use of indecent speech.[8] The Court upheld the authority of the F.C.C. to consider broadcasting of indecent language as the basis for administrative sanctions. Two aspects of that decision are pertinent to this case. First, Justice Stevens, writing the plurality opinion, distinguished between governmental authority to regulate "a point of view" and "the way

in which it is expressed." *Id.* at 746 n.22, 98 S.Ct. at 3038 n.22. As he observed, "A requirement that indecent language be avoided will have its primary effect on the form, rather than the content, of serious communication. There are few, if any, thoughts that cannot be expressed by the use of less offensive language." *Id.* at 743 n.18, 98 S.Ct. at 3037 n.18. Second, Justice Stevens grounded the Commission's authority significantly upon a legitimate governmental interest in regulating indecent language easily accessible to children. See *Ginsberg v. New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968). The Commission itself had made clear that it intended no absolute prohibition on the use of the indecent language, but "sought to channel it to times of day when children would not be exposed to it." 59 F.C.C.2d 892 (1976). The availability of the 2 p.m. broadcast to children was of obvious concern in both the plurality and concurring opinions of the Court. 438 U.S. at 749–50, 757–59, 98 S.Ct. 3026.

From these decisions, it is clear that speech that is indecent though not obscene can be regulated in some circumstances. Broad regulation that threatens to delete certain words from the language faces First Amendment barriers likely to be insurmountable, but limited regulation concerned with special places, special times, and special audiences may well be valid depending on the precise circumstances involved. Such limited regulation is well within the time, place, and manner authority recognized in *Cohen*,[9] and poses no threat

---

8. In the interim between *Cohen* and *Pacifica* the Court invalidated several convictions for public use of indecent language on the ground that the statute or ordinance under which the conviction had been obtained violated First Amendment standards because of overbreadth. *Lewis v. City of New Orleans*, 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974); *Plummer v. City of Columbus*, 414 U.S. 2, 94 S.Ct. 17, 38 L.Ed.2d 3 (1973); *Cason v. City of Columbus*, 409 U.S. 1053, 93 S.Ct. 565, 34 L.Ed.2d 507 (1972); *Rosenfeld v. New Jersey*, 408 U.S. 901, 92 S.Ct. 2479, 33 L.Ed.2d 321 (1972); *Lewis v. City of New Orleans*, 408 U.S. 913, 92 S.Ct. 2499, 33 L.Ed.2d 321 (1972); *Brown v. Oklahoma*, 408 U.S. 914, 92 S.Ct. 2507, 33 L.Ed.2d 326 (1972); *Gooding v. Wilson*, 405 U.S. 518, 92

S.Ct. 1103, 31 L.Ed.2d 408 (1972). In two instances *Cohen* was directly applied. *Hess v. Indiana*, 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973); *Papish v. Board of Curators of University of Missouri*, 410 U.S. 667, 93 S.Ct. 1197, 35 L.Ed.2d 618 (1973).

9. It must be acknowledged that this is not traditional time, place, and manner regulation, which is "applicable to all speech irrespective of content." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 209, 95 S.Ct. 2268, 2272, 45 L.Ed.2d 125 (1975). But regulation as to time and place solely because of the language used was plainly suggested in *Cohen* and explicitly upheld in *Pacifica*. Other courts have approved time and place regulation based on the

of deleting certain words from public discourse. Moreover, the element of choice on the part of the viewing or listening public, so central to the reasoning in *Cohen*,[10] has not been considered to be sufficiently present where juvenile audiences are involved. See *Ginsberg v. New York, supra,* 390 U.S. at 649–650, 88 S.Ct. 1274 (Stewart, J., concurring). When, as in this case, the audience at which a publication is specifically directed consists solely of high school students,[11] and distribution is demanded at a school building attended by students down to the age of 11,[12] First Amendment protection is not available for language that is indisputably indecent. If the F.C.C. can act to keep indecent language off the afternoon airwaves, a school can act to keep indecent language from circulating on high school grounds.

Justice Harlan was quite right to caution in *Cohen* that regulation of particular language runs some risk of regulating the expression of ideas. Justice Stevens in *Pacifica* may have discounted that risk too easily. But whatever the risk in the context of adult communication, it does not warrant an interpretation of the First Amendment that forbids school authorities from trying to regulate the distribution of indecent language to its students. Nor does the validity of such regulation depend on whether the use of such language will predictably lead to disruption.

School authorities can regulate indecent language because its circulation on school grounds undermines their responsibility to try to promote standards of decency and civility among school children. The task may be difficult, perhaps unlikely ever to be more than marginally successful. But whether a school condemns or tolerates indecent language within its sphere of authority will have significance for the future of that school and of its students. The First Amendment does not prevent a school's reasonable efforts toward the maintenance of campus standards of civility and decency. With its captive audience of children, many of whom, along with their parents, legitimately expect reasonable regulation, a school need not capitulate to a student's preference for vulgar expression. A school's authority to condemn indecent language is not inconsistent with a student's right to express his views. In short, the First Amendment gives a high school student the classroom right to wear Tinker's armband, but not Cohen's jacket.

School authority to regulate indecent language aimed at school children can of course be abused, but school officials are not the final arbiters of their authority, nor do they have limitless discretion to apply their own notions of indecency. Courts have a First Amendment responsibility to insure that robust rhetoric in student publications is not suppressed by prudish failures to distinguish the vigorous from the vulgar.

language used to express an opinion, as distinguished from the content of the opinion itself. *Durkin v. Taylor,* 444 F.Supp. 879 (E.D.Va. 1977) (prison); *Baker v. Downey City Board of Education,* 307 F.Supp. 517, 527 (C.D.Cal.1969) (high school); *see Webb v. Lake Mills Community School District,* 344 F.Supp. 791 (N.D.Iowa 1972) (high school theatre); *Pervis v. La-Marque Independent School District,* 328 F. Supp. 638 (S.D.Tex.1971) (high school), *rev'd on other grounds,* 466 F.2d 1054 (5th Cir. 1972).

10. In authoring *Cohen,* Justice Harlan could not have intended to create First Amendment protection for use of indecent language on a high school campus. He had dissented in *Tinker* when protection was extended to the entirely respectful display of an armband. 393 U.S. at 526, 89 S.Ct. 733 (Harlan, J., dissenting).

11. In this respect this case is unlike *Papish v. Board of Curators of University of Missouri,* 410 U.S. 667, 93 S.Ct. 1197, 35 L.Ed.2d 618 (1973), in which a student newspaper containing indecent language was protected on a university campus, notwithstanding the presence of some visiting high school seniors on the campus at the time of its distribution. *Id.* at 668 n.3, 93 S.Ct. 1197. *See also Rowan v. United States Post Office Department,* 397 U.S. 728, 741, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970) (Brennan, J., concurring expressing concern about regulating distribution of mailed matter to "children in their late teens").

12. The Granville Junior-Senior High School, at which the plaintiffs seek the right to distribute their publication, is a single building for students in grades 7 through 12, the youngest of whom are age 11.

**1058**

But this case does not require the careful drawing of the line that would allow ample margin for forceful language appropriate to the ideas being expressed. The language used in "Hard Times" is clearly indecent for juvenile audiences by contemporary standards.

The District Court properly rejected the students' demand for the right to distribute their publication on school property. The extent to which school authority might be asserted for off-campus activities need not be determined, since the school has disclaimed such power.[13]

---

**13.** I agree that school authority may be exercised for off-campus student activity, consistently with the First Amendment, whenever publication or other speech-related activity satisfies the *Tinker* test of creating a reasonable basis for forecasting interference or disruption of school activities. But there is no need to determine whether the *Tinker* standard was met in this case because discipline for off-campus activity was disclaimed by school authorities and therefore cannot be imposed consistently with the Due Process Clause.

Equally unnecessary for decision is the issue of whether the *Tinker* test is the only standard for determining whether school discipline may be imposed upon students for off-campus publication. I have expressed the view in the text, *supra*, that on-campus distribution may be regulated by student discipline when a publication containing clearly indecent language is circulated to an audience of high school students. Though the issue need not now be decided, it may be seriously doubted whether, unless the *Tinker* standard is met, school authority to discipline students for circulating vulgar material to high school students ends at the perimeter of the school grounds. Other courts have upheld school discipline for distribution occurring just off school grounds, where circulation on school property was intended and predictable. *Sullivan v. Houston Independent School District,* 475 F.2d 1071 (5th Cir.), *cert. denied,* 414 U.S.

1032, 94 S.Ct. 461, 38 L.Ed.2d 323 (1973); *Baker v. Downey City Board of Education,* 307 F.Supp. 517 (C.D.Cal.1969). School authorities ought to be accorded some latitude to regulate student activity that affects matter of legitimate concern to the school community, and territoriality is not necessarily a useful concept in determining the limit of their authority. Possibly the traditional standard of the law that holds a person responsible for the natural and reasonably foreseeable consequences of his action might have some pertinent applicability to the issue. A prudent application of the foreseeability concept, informed by First Amendment considerations, would surely be able to distinguish between extreme examples such as a student viewing an x-rated film on cable TV in his home and students publishing off-campus a vulgar newspaper that is aimed at students of a particular school, is sold exclusively to students of that school, and is distributed near the school grounds. The law is not incapable of distinguishing between activity that concerns the school community and activity that does not.

Whatever may be the reach of a school's power to regulate off-campus publication of indecent school-related materials, such issues need not be decided until a school asserts such authority.